IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LINDA WOMACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-0746-CV-W-GAF |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This is a proceeding under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, *et seq*. Plaintiff filed an application for disability benefits under Title II. The application was denied initially and on May 28, 2004, following a hearing, an administrative law judge (ALJ) rendered a decision in which he found that plaintiff was not under a "disability" as defined in the Act at any time when she met the earnings requirement of the law. On August 6, 2004, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

When reviewing the Commissioner's decision concerning disability benefits, courts may not decide facts anew, reweigh the evidence or substitute their judgment for that of the Commissioner. *See Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993) (citing *Jelinek v. Bowen*, 870 F.2d 457, 458 (8th Cir. 1989)). Rather, the standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Sampson v. Apfel*, 165 F.3d 616, 618 (1999); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir.

1996); *Carlson v. Chater*, 74 F.3d 869, 871 (8th Cir. 1996); *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995). Substantial evidence is that evidence which reasonable minds would accept as adequate to support the Commissioner's conclusion. *Williams v. Sullivan*, 960 F.2d 86, 89 (8th Cir. 1992). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996); *Shannon*, 54 F.3d at 486; *Onstead v. Sullivan*, 962 F.2d 803, 804 (8th Cir. 1992).[1]

Plaintiff's argument on appeal is that the ALJ improperly failed to find her impairment equaled the requirements of section 12.05(C). Section 12.05 of the Listed Impairments requires a showing of mental retardation, characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning, initially manifested prior to age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2004). Subsection C requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Id*.

Based upon plaintiff's intelligence testing scores, mental status evaluation, and self-reported activities, she was diagnosed with borderline intellectual functioning by a mental health professional. Plaintiff achieved a valid verbal IQ score of 77, performance IQ score of 77, and a full scale IQ score of 75 on the only intelligence testing of record. Using the lowest of these scores, the evidence does not satisfy the required test scores to establish plaintiff met the requirements of § 12.05(C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c)(2004).

---

[1] Upon review of the record and applicable authority herein, defendant's position is found to be controlling. Much of defendant's brief is adopted without quotation noted.

The evidence also fails to support plaintiff's claim she equaled the requirements of § 12.05(C). Listing level equivalence is a medical question. *See* 20 C.F.R. § 404.1526 (2004). The regulations impose responsibility for determining listing equivalence on the ALJ. *Id*. When considering medical equivalence, the adjudicator considers the medical opinion given by one or more medical or psychological consultants designated by the Commissioner. *Id*. Ordinarily, these consultants are retained by state agencies that contract with the Commissioner to make determinations at the initial and reconsideration levels of the administrative process.

The intelligence testing of record was performed by Dr. Israel on March 13, 2004. Those scores, (verbal 77, performance 77, and full scale 75) do not indicate medical equivalence in this case. Specifically, the scores do not indicate listing level severity, and the record does not support significant deficits in adaptive functioning. As section 12.05(C) and the <u>Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)</u> both provide, the diagnosis of mental retardation requires both subaverage general intellectual functioning and deficits in adaptive functioning. <u>DSM-IV</u> 39 (4th ed. 1994).

In particular, the DSM-IV explains that adaptive functioning refers to how effectively individuals cope with "common life demands," and how well they meet the standards of personal independence expected of one in their particular age group, sociocultural background, and community setting. *Id*. at 40. There are 10 adaptive skills areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id*. at 39. A diagnosis of mental retardation requires "significant limitations" in at least two of

3

these areas. *Id*. In addition to higher than listing level test scores, the record herein does not reflect the requisite deficits in adaptive functioning.

During plaintiff's examination in March of 2004, Dr. Israel noted plaintiff was friendly, appropriately dressed, and showed appropriate hygiene. Her speech was goal directed, and her flow of though showed no blocking, circumstantial or tangential thought processes, perseverance, flight of ideas, loose associations, or indecisiveness. Her mood did not reflect anxiety or depression, and her interview behavior was cooperative. Plaintiff stated she had friend with whom she visited, she had good relationships with other people, she enjoyed going to various activities with her children, she drove, and she performed most household chores.

During intelligence testing, plaintiff's span of attention, immediate auditory recall, social planning, and ability to anticipate and comprehend total situations was within the average range. Plaintiff followed instructions easily and related well to Dr. Israel. Dr. Israel further opined while plaintiff had some intellectual limitations, she had appropriate social skills, showed good concentration and persistence, and she should be able to adapt to most work related environments which were appropriate to her physical status. Thus, the only mental medical evidence does not show the necessary deficits in adaptive functioning.

In addition, during the May 14, 2004 administrative hearing, plaintiff testified she agreed with Dr. Israel's opinion with respect to her social skills, concentration and persistence abilities, and ability to adapt to work related environments. Thus, the evidence as a whole does not show the necessary deficits in adaptive functioning.

Plaintiff also argues that the agency Programs Operation Manual System (POMS) requires a finding of medical equivalence. "The POMS is a policy and procedural manual issued to help clarify the regulations for the Social Security Administration offices. This publication is merely a guideline for internal use within the Social Security Administration and does not carry the force of law." *Schwieker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam) (concluding that claims manual rules promulgated for claims representatives do not bind the Social Security Administration); *Tejada v. Apfel*, 167 F.3d 770, 775 (2nd Cir. 1999); *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir. 1994); *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991); *Parker v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989); *Evelyn v. Schweiker*, 685 F.2d 351, 352 n.5 (9th Cir. 1982).

The court in *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003), stated that although not legally binding, the POMS should be considered. The record in this case shows that agency policy was followed. The ALJ stopped the first administrative hearing and ordered intelligence testing to appropriately consider whether plaintiff met or equaled the listings. The ALJ thereafter considered the results of the examination and testing in his decision. It was not necessary to specifically identify the POMS section in the ALJ's decision. *See Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987).

It is also noteworthy that plaintiff successfully worked for 15 years with her level of intellectual functioning and has shown no sustained decrease in her mental abilities.

Furthermore, plaintiff's IQ scores are not representative of the severity intended by POMS DI 24515.056, as she claims. In fact, POMS states that,

> "[t]he criteria for this paragraph [12.05C] are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g. 70-75) in the presence of other physical or mental disorders that impose additional and

5

> significant work-related limitations of function may support an equivalence
> determination. It should be noted that generally the higher the IQ, the less likely
> medical equivalence in combination with another physical or mental impairment(s) can
> be found."

*Id*. In this case, plaintiff's lowest score barely falls within the upper most range referred to by the POMS. Her verbal and performance scores, reported activities, and presentation during evaluation and testimony, however, indicate mental abilities in excess of those intended by the listings. Moreover, even assuming arguendo that scores of 77 verbal IQ, 77 performance IQ, and 75 full scale IQ are an initial indication that medical equivalency should be considered. Plaintiff still does not have the necessary deficits in adaptative functioning to be found disabled pursuant to § 12.05(C).

WHEREFORE, for the reasons stated herein, the Commissioner's decision is affirmed.

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: May 23, 2005